Filed 2/3/15 In re H.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061562 |
| Plaintiff and Respondent, | (Super.Ct.No. J245477) |
| v. | OPINION |
| D.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Lily L. Sinfield, Judge. Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Regina A. Coleman, Principal Assistant County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant D.C. (father) is the biological father of the minor H.C., who is the subject of this dependency proceeding. He appeals the termination of his parental rights with respect to H.C., contending that the juvenile court should have found applicable the beneficial parental relationship exception to termination of parental rights, codified at Welfare and Institutions Code,[1] section 366.26, subdivision (c)(1)(B)(i). We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

H.C. was five months old when she came to the attention of plaintiff and respondent San Bernardino County Children and Family Services (CFS) on August 5, 2012. Two hospitals where she was treated for a depressed skull fracture submitted referrals on that date, suspecting physical abuse by an unknown perpetrator.[2] H.C.'s injury required surgical repair.

At the time of H.C's injury, she was in the care of her mother, as was her then two-year-old half sibling, E.C.; father was incarcerated, and had been since before H.C. was born.[3] When asked to describe what had happened, mother initially reported that she had just arrived at the home of a friend, with the two children in a stroller. Mother described placing H.C. on a bed, leaving E.C. asleep in the stroller, and going to the

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] H.C. was initially taken by ambulance to San Antonio Community Hospital, and later transferred to Children's Hospital of Orange County for surgery.

[3] Only father's rights with respect to H.C. are at issue in this appeal, so our discussion of E.C. and mother will be limited to what is necessary for context.

kitchen to prepare a bottle. A few minutes later, she heard H.C. whining a little, and then crying loudly. She returned to find H.C. lying on her stomach on the tiled floor, and noticed a slight indentation on the side of her head when she picked her up. Mother said her friend would not allow her to call for emergency medical help from the home, because he was concerned about law enforcement coming to his house, so mother walked several blocks to another friend's home and called for an ambulance.

On August 6, 2012, CFS obtained a custody warrant and removed H.C. from mother's custody. At the detention hearing on August 9, 2012, the trial court considered the dependency petition filed by CFS, alleging that H.C. came within section 300, subdivisions (a) (serious physical harm, (b) (failure to protect), and (g) (no provision for support). With respect to father, the petition alleged that he knew or should have known of H.C.'s abuse or neglect, and that he was incarcerated without providing for her care or support.

The juvenile court found a prima facie case had been established for detention. The court ordered father, who was present in court for the detention hearing while in custody, to have one hour supervised visits with H.C. once per week, to commence upon his release. No relatives were able and willing to care for the children, so the court ordered H.C. placed in foster care.

On August 29, 2012, CFS filed an amended dependency petition. Mother's story regarding the incident resulting in H.C.'s injury had changed. She now stated that on August 5, 2012, she and her children were transient, so they were sleeping in the laundry facility of an apartment complex. H.C.'s sibling was sleeping in a stroller, while H.C.

3

was lying on a folding table, with mother next to her. Mother dozed off, and woke up to the sound of H.C. crying, and lying face down on the concrete floor. Mother picked up H.C. to examine her for injuries, and discovered that her head felt "strange." She rushed to her friend's apartment nearby for help. The friend encouraged her to tell the story that she initially told to CFS about what had happened.

With respect to father, the amended dependency petition added allegations that father had a history of arrests and incarcerations, engaging in domestic violence, and substance abuse. The amended petition further alleged that his ability or willingness to provide for H.C. was unknown, and that he had failed to provide for H.C.'s basic needs of food, clothing, and shelter.

CFS also filed a jurisdiction/disposition report on August 29, 2012. The report specified that father had been arrested in 2004, 2005, 2006, 2008, 2009, 2010, 2011, and 2012, including an arrest in October 2012 for domestic violence and battery against mother, for which he served jail time. Father had not yet completed a court-ordered domestic violence course because of his current incarceration on drug charges. Father remained incarcerated, as he had been since before H.C.'s birth, but was expected to be released by January 2013 or sooner.

A contested jurisdiction/disposition hearing was held, after several continuances, on January 15, 2013. Father was present in court and out of custody; mother was present in custody, having been arrested in September 2012 for attempting to kidnap H.C. and E.C. during a supervised visitation. The court removed H.C. from the custody of her parents and ordered her to remain in foster care. The court found, based on previously

4

ordered paternity testing, that father is the biological father of H.C., and that it was in the best interest of the child to offer him services. The court set father's visitation at one time per week for one hour, supervised, to be liberalized as the social worker deemed appropriate.

The CFS six-month status review report filed in July 2013 noted that father was participating in his service plan and making steady progress. It was anticipated that he would complete the plan within the next three weeks. The report noted, however, that father was not ready to take custody of H.C. because he continued to struggle to find a suitable living arrangement. Father was observed to be "nurturing" during visitation. At the six-month status review hearing, the court found that father had made "substantial" progress toward alleviating or mitigating the causes necessitating placement, and set visitation at a minimum of one time per week for one hour, unsupervised, to be liberalized as to frequency and duration, including overnights or weekend visits, when deemed appropriate by the social worker.

The CFS 12-month status report filed in October 2013 recommended father continue to receive reunification services, and noted that father had completed his service plan. Father continued, however, to struggle to find a suitable living arrangement. Additionally, father had been working full time in Irvine, making it impossible for him to submit to random drug testing since July 2013. Mother had been released on parole, choosing an inpatient substance abuse treatment program over prison. Father had participated in weekly supervised visitation with H.C. and E.C. at mother's treatment program; the social worker noted that the parents "interacted very well with the children

during their visits." The visits stopped, however, when mother left treatment on September 16, 2013, without completing the program, and in violation of her probation conditions.

Counsel for H.C. and E.C. initially contested the recommendation for continued services, but at a pretrial conference on December 6, 2013, informed the court that a settlement had been reached to allow for continued services. On the same date, the minors' counsel filed a section 388 petition requesting the court again require father's visits to be supervised, in light of the circumstance that he had not submitted to random drug testing since July 2013. The court granted the section 388 petition and ordered reunification services for father to continue, with visitation to be one time per week for two hours, supervised, to be liberalized as to frequency and duration as deemed appropriate by the social worker, and with authorization for the visits to become unsupervised following three consecutive clean drug tests. Father was ordered to drug test that day.

The CFS 18-month status report filed in February 2014 notes that father did submit to drug testing on December 6, 2013, as ordered; the test was positive for marijuana. Subsequently, he failed to submit to drug testing at all. Moreover, father called to schedule two visitation appointments, but failed to show up; he had no visits with H.C. since September 2013. The social worker had been unable to contact him, and his whereabouts were unknown. The recommendation of CFS was to terminate services for both father and mother (who had been sentenced to an eight-year prison term for violating her probation) and set a section 366.26 hearing to establish a permanent plan of

6

adoption, and the court so ordered. Pending the section 326.26 hearing, the court set visitation at one time per month for one hour, supervised, with the social worker authorized to liberalize visitation as to frequency and duration when deemed appropriate.

The CFS section 366.26 report filed in June 2014 states that father participated in visitation with H.C. in March and April 2014. But at the contested section 366.26 hearing, held on July 17, 2014, father acknowledged missing two visits since then, in May and June 2014.[4] He attributed the gap in visitation between September 2013 and March 2014 to "homelessness," which left him without clean clothes or a shower, and no money. When asked why he had missed two monthly visits more recently, he stated: "I guess I had some other stuff to do, which wasn't really important." He admitted that he felt "[k]ind of bad" about missing the visits, because he "should have end[ed] up seeing [his] kids, instead of taking care of other stuff." Father testified, however, that the visits he did have were positive; both H.C. and E.C. called him "daddy," were engaged and enjoyed interacting with him during the visit, and were sad to see him leave.

The CFS section 366.26 report further states that H.C. and E.C. were adjusting well to their current placement with prospective adoptive parents; H.C. in particular began calling them "mommy and daddy" immediately. The report asserts that termination of parental rights would not be detrimental to H.C., and that none of the exceptions to adoption in section 366.26, subdivision (c)(1) apply. It concludes with the recommendation that parental rights be terminated, and a permanent plan of adoption be

---

**4** Father did visit with the children in July 2014, the day before the section 326.26 hearing.

implemented. The court followed the CFS recommendation, among other things by terminating father's parental rights to H.C. With respect to the beneficial parental relationship exception to adoption, the court found that father had visited H.C. "not as consistently as what would identify as a parental role," and though he is a "cared-about individual in [H.C.'s] life," he "does not fall within that parental role beyond the fact of biology."

## II. DISCUSSION

Father contends that the juvenile court erred by terminating his parental rights as to H.C. despite the existence of a beneficial parental relationship between father and H.C. He argues that the court should have ordered "a lesser plan of legal guardianship." We find substantial evidence supports the juvenile court's factual findings that father's visitation had not been regular and that there was no parental relationship between father and H.C. sufficient to trigger the beneficial relationship exception to termination of parental rights. We therefore affirm.

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the preferred permanent plan because it is more secure and permanent than legal guardianship or long-term foster care. (*Ibid.*) "Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child'" under one or more of the exceptions set forth in section 366.26, subdivision (c)(1)(B). (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).) One

8

such exception is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parental relationship exception to termination of parental rights, a parent has the burden of showing "both regular visitation and contact [with the child] and the benefit to the child in maintaining the parent-child relationship." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81 (*Helen W.*); see § 366.26, subd. (c)(1)(B)(i).) With respect to the "benefit to the child" prong of the exception, a beneficial relationship is one that "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534 (*Brandon C.*).) The parent has the burden of demonstrating that "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

We apply the substantial evidence standard of review to the trial court's factual determinations, including the issue of regular visitation and contact with the child, and the existence of a beneficial parental relationship.[5] (*Bailey J.*, *supra*, 189 Cal.App.4th at

---

[5] The determination of whether the existence of that relationship constitutes "a '*compelling reason* for determining that termination would be detrimental'" to the child within the meaning of section 366.26, subdivision (c)(1)(B) is a "'quintessentially' discretionary decision," which we would review under the deferential abuse of discretion standard. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) Such an analysis, however, is not necessary for the resolution of this appeal.

p. 1314.) When the party with the burden of proof appeals, contending the trier of fact erred in concluding that party failed to meet his or her burden, the question on appeal "becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Accordingly, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'" (*Bailey J.*, *supra*, at p. 1315.)

The record here does not compel a finding in favor of father as a matter of law. There is substantial evidence that father's visitation with H.C. was not regular. Although the court, following the July 2013 six-month review hearing, allowed father unsupervised visitation, he instead participated only in supervised visitation, together with mother. Even those visits ceased in September 2013, after which father did not see or contact H.C. again until March 2014; during this interval, he twice failed to attend scheduled visits, and was otherwise out of contact with CFS, whereabouts unknown. Father visited with H.C. in March and April 2014, and again in July 2014, but failed to do so in May or June 2014, because he "had other stuff to do . . . ." This record of visitation does not come close to compelling the conclusion that father's visitation and contact with H.C. was sufficiently regular as to establish the first prong of the beneficial parental relationship exception. (See *Helen W.*, *supra*, 150 Cal.App.4th at pp. 80-81; § 366.26, subd. (c)(1)(B)(i).)

There is also substantial evidence in support of the juvenile court's determination that father had failed to establish the existence of a beneficial parental relationship. Father was entirely absent from approximately the first eight months of H.C.'s life due to his incarceration. He was absent from her life again for six months, between September 2013 to March 2014, with a total of three visits after the latter date. H.C. was approximately two years old as of the section 366.26 hearing; thus, father had at that point been entirely absent for more than half of H.C.'s life, with only brief, occasional visits during the remainder. Father never had even a single unsupervised visit with H.C., though such visits were at one point authorized by the court. The sporadic supervised visits that father did have with H.C. were by all accounts pleasant, but nothing in the evidence compels the conclusion that H.C. developed a substantial positive emotional attachment with father that goes beyond that of a friendly, occasional visitor. (See *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 576-577 [finding substantial evidence supports order terminating parental rights, despite "'friendly visitor'" and "'family friend'" relationship between parent and child].)

In short, father fails to demonstrate either regular visitation and contact with H.C., or the existence of a parent-child relationship between him and H.C., let alone a relationship that promotes H.C.'s well-being to such a degree as to outweigh the benefits of a permanent home with new, adoptive parents. (See *Brandon C.*, *supra*, 71 Cal.App.4th at p. 1534.) As such, father demonstrated no error.

11

## III.  DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                                        HOLLENHORST

                                                             Acting P. J.

We concur:

KING
                           J.

CODRINGTON
                           J.